IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **JEREMY STANECKI,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 4:13-CV-0484-RDP |
| ) | |
| **CAROLYN W. COLVIN, Commissioner** ) | |
| **Social Security Administration,** ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OF DECISION

Plaintiff Jeremy Stanecki ("Plaintiff") filed a claim for Supplement Security Income ("SSI") pursuant to Title XVI of Section 1631(c)(3) of the Social Security Act (the "Act"). *See* 42 U.S.C. § 1383(c). Plaintiff now seeks review of the decision by the Commissioner of the Social Security Administration ("Commissioner") denying his claim. Based on the court's review of the record and the briefs submitted by the parties, this court finds that the Commissioner's decision is due to be affirmed.

**I.     Proceedings Below**

Plaintiff filed his application for benefits on May 17, 2010, alleging disability beginning on June 1, 1998. (Tr. 188). Plaintiff's potential onset date is May 17, 2010. *Id*. His claim was denied by the Social Security Administration on September 30, 2010. (Tr. 61). On November 8, 2010, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 129-31). Plaintiff's request was granted, and he received an initial hearing before ALJ B. Lloyd Blair on May 23, 2011.[1] (Tr. 103-113, 138). After Plaintiff obtained counsel, the hearing was

---

[1] Plaintiff told the ALJ he could not read the proposed exhibits for the proceeding. (Tr. 110). Thus, the ALJ continued the hearing in order to give Plaintiff adequate time to obtain representation. (Tr. 103-113).

rescheduled for October 24, 2011.[2] (Tr. 28-59, 158). On November 17, 2011, the ALJ issued a decision finding that Plaintiff was not disabled under section 1614(a)(3)(A) of the Act. (Tr. 16-24). After notification of the ALJ's decision, Plaintiff timely filed an appeal with the Appeals Council on June 30, 2011, which was denied, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6). Accordingly, this case is properly before this court for appellate review. *See* 42 U.S.C. § 1383(c).

## II.     Statement of Facts

Plaintiff was born on March 24, 1968, making him 43 years old at the time of the hearing. (Tr. 22, 188). Plaintiff completed the ninth grade, but his mother testified at the hearing that Plaintiff attended special education classes in school. (Tr. 33, 52). Plaintiff contends that his disability under the Act began on June 1, 1998. In his application, he alleged disability due to anxiety, dyslexia, bipolar, Hepatitis, arthritis, and attention deficit disorder. (Tr. 114). Plaintiff testified during the hearing, however, that he attributed his disability to bipolar disorder mixed with severe psychosis, his back operation, dementia, Hepatitis C, the nerves "burned out of [his] back," and arthritis in ninety percent of his body. (Tr. 35). Plaintiff previously worked as a carpet layer "on and off, here and there" for fifteen years, but he has not worked since his potential onset date of May 17, 2010.[3] (Tr. 34, 182). Plaintiff further testified that the State of Michigan Department of Human Services ("DHS") determined he was "disabled," and he recently started receiving Medicaid cash assistance ("Medicaid").[4] (Tr. 35).

---

[2] Plaintiff was represented by a non-attorney representative. (Tr. 31).

[3] Plaintiff also testified that he thought he worked at K-Mart for a few months when he was fifteen as well. (Tr. 34).

[4] According to Plaintiff, a state disability hearing was held on August 3, 2011. (Tr. 545). However, it is unclear from the record what DHS's determination was initially or what the judge's determination was in response. (Tr. 542). The record does include a note from an August 18, 2011, Easter Seals Progress Note that indicates that

Plaintiff was incarcerated from 2005 until 2008 for armed robbery, possession of crack cocaine and heroin, and distribution of marijuana and is currently on parole until 2014. (Tr. 20, 464). In addition to his criminal history, Plaintiff has an extensive substance abuse history with alcohol, heroin, cocaine, and methamphetamines but claims to have been sober for the most part since he was released from prison. (Tr. 267). Plaintiff relapsed in November 2009 and received a DUI which was a violation of his parole. *Id.* Other than this instance, he has indicated that he has been free of substance abuse for four years. (Tr. 267-68). Plaintiff has been diagnosed with bipolar 1 disorder, MRE, severe with psychotic features, ADHD, hyperactive or combined, learning disorder, NOS, opioid dependence and other unspecified alcohol dependence in remission. (Tr. 260). Additionally, Plaintiff suffers from chronic back pain, Hepatitis C,[5] and arthritis. (Tr. 252, 315-17, 500).

On July 6, 2009, Plaintiff received his initial assessment from Easter Seals. (Tr. 257). In this assessment, Plaintiff reported that he is bipolar with highs and lows but nothing in between. *Id.* He further reported that he has trouble sleeping due to his bipolar "highs" and depression, and he also hears his name being called a few times a week when no one is there. *Id.* Plaintiff acknowledged a history of substance abuse involving cocaine, methamphetamine, and alcohol but had been clean for 30 months at the time of the assessment. *Id.* Additionally, he stated that he had been hospitalized on four occasions at ages 15, 16, 30, and 38 for "accidental overdose and for being uncontrollable." (Tr. 264). Bethany Piccinato, the administrator of the assessment, noted that Plaintiff's speech, motor activity, and thought process was unremarkable; his remote and recent memory, judgment, and insight were fair; his intellectual functioning was average; his

---

Plaintiff had called Easter Seals and reported that the DHS's decision regarding his disability had been overturned. (Tr. 542).

[5] Plaintiff has been diagnosed with Hepatitis C for more than 20 years. (Tr. 500).

perceptions were normal with a broad affect-range of emotion; and his impulse control was poor, citing to his history of substance abuse as an explanation. (Tr. 259). Piccinato recommended both a psychiatric evaluation and medications be given to Plaintiff and indicated that his level of care needed was "three." (Tr. 262).

On July 27, 2009, Plaintiff met with Dr. Nicanor Castedo at Easter Seals. (Tr. 297). She reported that Plaintiff was alert and aware, and he responded in a coherent and relevant manner. *Id*. Dr. Castedo did note that Plaintiff had not been taking his medications for the last five months. *Id*. Still, Plaintiff reported that the medications, Thorazine and Triavil, were "very effective" while he was in prison and made him "much better." *Id*.

Plaintiff then met with another psychiatrist at Easter Seals, Dr. Carol Flippen, on August 24, 2009. (Tr. 275). Plaintiff claimed he was currently taking 25 mg of amitriptyline, 200 mg of Thorazine, and 2 mg of Trilafon and had been for a year and one-half. *Id*. He reported that he was sleeping well, had a good appetite, had energy, and maintained a "pretty good" mood. *Id*. Dr. Flippen noted that Plaintiff's clinical status was stable, and he should continue with his current medications, seeing his case manager as needed. (Tr. 277). On October 20, 2009, he met with a different psychiatrist at Easter Seals, Dr. Surjeet Bagga. (Tr. 279-80). Dr. Bagga noted that Plaintiff's clinical status was improving, thereby keeping him on the same medications. On December 15, 2009, Plaintiff met with Dr. Malathy Nair who also reported that he was stable and ordered continuation of his medications. (Tr. 283).

Plaintiff continued his appointments with Easter Seals in 2010. (Tr. 270-84). On February 15, 2010, Plaintiff had an appointment with Dr. Datla Raju who reported that Plaintiff was "doing fair" and denied any mood swings.[6] (Tr. 286). Dr. Raju indicated that Plaintiff's clinical status was improving and prescribed only Thorazine and amitriptyline/perphenazine

---

[6] Plaintiff did report being depressed a few days prior to his appointment. (Tr. 286).

25/2. *Id*. On April 12, 2010, Plaintiff met with Dr. Raju again. (Tr. 288). This time, Dr. Raju indicated that Plaintiff's clinical status was stable, that he reported he was "doing better," and that he should continue his medications as prescribed. (Tr. 288-89). Plaintiff again saw Dr. Raju at Easter Seals on June 7, 2010. (Tr. 293). During this visit, Dr. Raju indicated that Plaintiff was stable on his medications and should continue use. (Tr. 295).

On June 25, 2010, Plaintiff underwent a reassessment by Easter Seals. (Tr. 267). At that time, Plaintiff reported that he likes to "fish, hang out on the boat, and watch movies." *Id*. Plaintiff was taking 25 mg of amitriptyline/perphenazine and 200 mg of Thorazine at the time. (Tr. 268). He did not report any significant sleep problems and reported that he was "feeling good on his current medications." (Tr. 267). In fact, Plaintiff indicated that his symptoms were manageable at the time due to the medication. (Tr. 270). Plaintiff further reported that he "cleans, shops, manages money and grooms with no problems" and was also doing side jobs to cover the payment of housing with his brother. *Id*. At that time, Plaintiff was receiving $400/month in Cash Assistance from DHS and a Bridge Card for $369/month. *Id*.

On December 29, 2010, Plaintiff was admitted to Havenwyck Hospital ("Havenwyck") after a neighbor reported a suspected overdose. (Tr. 316, 324). Plaintiff denied any suicidal thoughts.[7] (Tr. 414-16). After examining Plaintiff, the attending physician, Dr. Do Syng Yoon, referred Plaintiff to Dr. Lee Marshall for a neurological consultation and to Dr. Kanmatha Reddy for a psychiatric consultation.[8] (Tr. 312, 315). Dr. Marshall reported that Plaintiff was "awake, alert, and attentive," and though his strength was full, he complained of pain. (Tr. 313). Dr.

---

[7] Plaintiff stated that he was not in the hospital for an attempted overdose. Rather, he took a pain pill, Neurontin, and it made him feel like he was dying. He thus crawled to his neighbor and asked him to call 911. (Tr. 464).

[8] Plaintiff also underwent an initial assessment with a social worker at Havenwyck, reporting that he was an "adrenaline junkie"–his hobbies and interests included "cocaine, heroin, skiing, and jumping out of planes." (Tr. 464).

Marshall noted that Plaintiff had a nerve block two months prior, and it "has been helping considerably along with oral medications for pain." (Tr. 312). According to Dr. Marshall, Plaintiff's neurological examination suggested "radiculopathy left lower extremity S1 distribution." (Tr. 313). At the time, Plaintiff was taking Norco,[9] Neurontin,[10] Depakote, Thorazine, Haldol, Catepres, and Restoril. (Tr. 312). Dr. Marshall recommended Plaintiff continue his prescribed analgesic use. (Tr. 313).

While admitted at Havenwyck, Dr. Reddy conducted a history, physical, and neurological consultation of Plaintiff. Dr. Reddy specifically observed that Plaintiff had "chronic back pain and also pain medication seeking behavior" because Plaintiff sought to double his current medication and was "asking for the pain medication again and again." (Tr. 315). Dr. Reddy further noted in his assessment that Plaintiff was noncompliant with the medical treatment and suffered from bipolar disorder with major depression. *Id.* However, regarding the latter, Dr. Reddy recommended Plaintiff follow up with Dr. Yoon for his psychiatric issues. *Id.* Also while admitted at Havenwyck, Dr. Yoon reported that Plaintiff's identified weakness was his noncompliance.[11] (Tr. 317). In fact, Plaintiff stated that he had been noncompliant with his medications for three weeks.[12] (Tr. 316). Plaintiff was discharged on January 5, 2011, by Dr. Yoon who reported that Plaintiff was "doing better in terms of mood and depression, not

---

[9] Dr. Marshall indicated that this medication appeared to be "quite effective." (Tr. 312).

[10] This is the medication Plaintiff claimed to have taken that caused him to be hospitalized. (Tr. 464).

[11] There are also other indications in the record that Plaintiff was noncompliant with his medications. Plaintiff reported to Easter Seals on June 27, 2011, that he had been out of his medications for a couple of weeks and did not know how to refill them. (Tr. 570). Prior to this date, Plaintiff reported to Easter Seals that he had been cutting his Seroquel in half. (Tr. 592). Easter Seals informed Plaintiff that doing so causes the medication not to work appropriately. *Id.* Additionally, on July 22, 2011, Plaintiff reported to Easter Seals that he was compliant with his medications "sometimes." (Tr. 551).

[12] Despite Plaintiff's assertion of non-compliance, in his multidisciplinary assessment on the date he was admitted, Plaintiff reported that one of his strengths was his "willingness to take his medications." (Tr. 412).

hyperverbal, nor irritable [ ]or demanding, tolerating medication well." (Tr. 318). Dr. Yoon also noted that Plaintiff was "alert and fully oriented" and his "memories to recent and remote events were grossly intact." (Tr. 317). Plaintiff was motivated to continue treatment, and Dr. Yoon recommended he follow up with his primary care physician for his medical issues[13] and visit Shawna Merritt at Easter Seals on an outpatient basis. *Id*. At the time of discharge, Plaintiff was taking Seroquel and Depakote. *Id*.

On March 1, 2011, case manager M. Brown of the State of Michigan Department of Human Services, Oakland County Walled Lake District, offered his opinion in a Social Summary that Plaintiff is "unable to do manual labor due to arthritis and back pain." (Tr. 322). Brown also indicated that Plaintiff had difficulty with memory, reading, signs of pain or distress, sitting, standing, understanding, using hands, walking, withdrawal, and writing. (Tr. 322). Plaintiff reported to Brown that his sleeping had improved and his appetite had returned since being on his new psychiatric medications. (Tr. 326-27). He further stated that he was responsible for his personal care, though moving around was painful. (Tr. 327). Plaintiff further reported that he visits his dad and brother and was also picking up the hobby of ice fishing.[14] (Tr. 329).

Plaintiff's case manager from Easter Seals, Shawna Merritt, performed a mental RFC assessment of Plaintiff on March 22, 2011, indicating that Plaintiff had mostly moderate limitations but had marked limitations in the following areas: the ability to understand and remember detailed instructions,[15] the ability to carry out detailed instructions and maintain attention and concentration for extended periods, the ability to sustain an ordinary routine

---

[13] Dr. Kahn is Plaintiff's pain management physician. (Tr. 332).

[14] Plaintiff reported that he had only gone ice fishing three times. (Tr. 329).

[15] However, Ms. Merritt also noted that he only had moderate limitations in understanding one to two-step instructions. (Tr. 335).

7

without supervision,[16] the ability to complete a normal workday and worksheet without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to accept instructions and respond appropriately to criticism from supervisors. (Tr. 335-36). However, the record shows that during his other visits with Ms. Merritt at Easter Seals, Plaintiff repeatedly reported that he felt great on his medications and that they were helping him significantly. (Tr. 592, 598, 604, 620). Particularly on January 10, 2011, Ms. Merritt reported that Plaintiff did not have much pain because he had surgery the previous week. (Tr. 620). On July 22, 2011, Dr. Niru Gill saw Plaintiff for a status exam, noting that Plaintiff was improving and should continue his medications.[17]

In December 2012, Plaintiff's case was closed at Easter Seals because his last kept appointment was on April 12, 2012. (Tr. 499, 507). Plaintiff's discharge summary indicated that his current and highest GAF was 50, with a current GAS at 60. (Tr. 500). As of May 21, 2012, Plaintiff was taking Invega, Seroquel, Clondine, and Norco. (Tr. 500-01). On August 27, 2012, Plaintiff reported that he was living in Georgia, although he now lives in Alabama. (Tr. 507).

**III.    ALJ Decision**

Determination of disability under the Act requires a five-step analysis. *See* 20 C.F.R. § 404.1, *et. seq.* First, the ALJ determines whether a claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity" is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If a claimant engages in gainful

---

[16] Ms. Merritt found Plaintiff only moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 336).

[17] Dr. Gill indicated that Plaintiff's thought content was within normal limits, his thought process was goal-directed, and his impulse control and judgment were both adequate. (Tr. 527).

work activity, then the claimant cannot claim disability.  Second, the ALJ determines whether a claimant has a medically determinable impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities.  Absent such impairment, a claimant may not claim disability.  Third, the Commissioner determines whether a claimant's impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  If such criteria are met, the claimant is declared disabled.

If a claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must first determine a claimant's RFC, which refers to the claimant's ability to work despite his impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether a claimant has the RFC to perform past relevant work.  If a claimant is determined to be capable of performing past relevant work, then he is deemed not disabled.  If the ALJ finds a claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.

In the last part of the analysis, the ALJ must determine whether a claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(g), 404.1560(c).

In this case, the ALJ made the following determinations: (1) Plaintiff has not engaged in substantial gainful activity since the date of his application for SSI; (2) Plaintiff has three severe impairments—osteoarthritis of the lumbar spine, Hepatitis C, and bipolar disorder with psychotic features and memory loss; (3) Plaintiff's impairments or a combination thereof do not meet or

medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) Plaintiff has the RFC to perform light work;[18] (5) Plaintiff cannot perform any past relevant work; and (6) there are jobs in the national economy that Plaintiff is able to perform. (Tr. 18-22). Based upon these findings, the ALJ found that Plaintiff was not disabled and denied Plaintiff's claim for SSI. (Tr. 24).

## IV. Plaintiff's Argument for Reversal

Plaintiff asserts two grounds for reversal of the ALJ's decision: (1) the ALJ erred when he failed to address his testimony that DHS recently found him "disabled" for purposes of Medicaid, and (2) the ALJ erred in failing to conclude that his impairments would cause high absenteeism, precluding employment. (Pl.'s Br. 6-10).

## V. Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42, United States Code, Sections 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute

---

[18] The ALJ stated, "[C]laimant has the [RFC] to perform light work as defined in 20 C.F.R. 416.967(b) except claimant can never use ladders, ropes or scaffolds; may only occasionally use ramps or stairs, kneel stoop, crouch or crawl; must avoid concentrated exposure to extreme cold and vibrations; can never use pneumatic, torque or power tools; must avoid concentrated exposure to hazards including dangerous and unprotected machinery and heights; is limited to simple and unskilled work with an SVP rating of one or two; cannot perform work that requires more than three step instruction; cannot perform jobs that involve concentration on detailed/precision tasks or multi-tasking, reading, computing/calculating or problem solving; cannot work on jobs that require team wok [*sic*] or working in close physical proximity of co-workers; cannot be required to take initiative or make independent decisions; cannot have a production quota mandating a specific number of pieces per hour or an up line or down line co-worker depending on claimant for productivity." (Tr. 19).

its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## VI.  Discussion

After careful review, the court concludes that the ALJ's findings are supported by substantial evidence and that the ALJ applied the correct legal standards.

### A.  Substantial Evidence Supports the ALJ's Determination Denying Plaintiff's Disability Benefits, and the ALJ did not Err by Failing to Mention the State of Michigan DHS's Finding of Disability.

Plaintiff first alleges that the ALJ is required to consider and address the determinations of other agencies regarding a claimant's disability. (Pl.'s Br. 7). To be clear, another governmental or nongovernmental agency's decision as to whether a claimant is disabled is not binding on the Commissioner. 20 C.F.R. § 404.1504. Such an agency makes its determination pursuant to its standards while the Commissioner must make his decision based on the rules and requirements under Social Security law. *Id.* However, the Eleventh Circuit has noted that "[t]he findings of disability by another agency, although not binding on the Secretary, are entitled to

great weight." *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir. 1984) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1241 (11th Cir. 1983)). That is the case even if the rules and regulations to determine disability of the other agency differ from the Social Security rules, so long as the term "disability" is to be construed similarly by the SSA and the other agency. *See Falcon*, 732 F.2d at 831 (noting that the finding of claimant's disability by the Florida Worker's Compensation Division should have been given great weight because the Florida Supreme Court construed its definition of disability in a like manner to that of the Social Security definition). Nevertheless, another agency's decision is not entitled to great weight when there is little evidence in the record to support the finding. *See Hughes v. Comm'r of Soc. Sec.*, 486 Fed. Appx. 11 (11th Cir. 2012) (holding that the ALJ did not err in giving little weight to a disability determination by a state agency when plaintiff only presented a single page document stating approval for the benefits); *see also Lafferty v. Astrue*, 559 F. Supp. 2d 993, 1010 (W.D. Mo. 2008) (finding "no error in the ALJ's failure to mention the finding of disability by Medicaid").

Although there are very few cases in the Eleventh Circuit with the same facts presented in this case, the *Hughes* decision is the most analogous. In *Hughes*, the court found substantial evidence to support the ALJ's decision to give little weight to the state's disability determination. 486 Fed. Appx. at 16. The single page document submitted by the claimant in *Hughes* only included a declaration of approval of benefits and failed to explain the grounds upon which those benefits were granted. *Id*. Both the court and the ALJ further noted that claimant also failed to provide any additional evidence regarding the state's finding of disability that would have led to a different outcome. *Id*.

Here, there is even less evidence in the record to support the state's disability determination. In fact, Plaintiff did not submit any evidence into the record to support the

Medicaid determination (aside from his own testimony when questioned briefly at the ALJ hearing).[19] (Tr. 35). Plaintiff testified that the state's disability determination was approved due to the arthritis in his back, knees and feet, his Hepatitis C, and his bipolar condition, but the ALJ considered all of these conditions in making his determination and assessing Plaintiff's RFC. (Tr. 20-22). Thus, like the claimant in *Hughes*, Plaintiff has failed to provide any evidence upon which the Medicaid decision was based that was *not* considered by the ALJ. Because Plaintiff did not provide any evidence to support his testimony that he was deemed disabled by DHS for state Medicaid benefits or present any additional evidence upon which DHS relied, the ALJ did not err in failing to mention the state's disability determination.

While the Eleventh Circuit has not expressly determined the issue, some courts have upheld the ALJ's failure to mention another agency's finding of disability when the ALJ considered the same evidence used by the other agency. *E.g., Lafferty*, 559 F. Supp. 2d 993. In *Lafferty*, the only evidence in the record that the claimant submitted in support of the state agency's finding of disability was a copy of her Medicaid card. 559 F. Supp. 2d at 1010. The court held that "where an ALJ does not mention another agency's finding of . . . disability, there is no error if the ALJ fully considered the evidence underlying that agency's final conclusion regarding disability." *Id*. Furthermore, similar to what occurred in *Hughes*, this court also relied upon the notion that the claimant failed to present any evidence used by the state Medicaid agency in making its determination that the ALJ did not consider as well. *Id*.

Here, again, Plaintiff's only evidence of the state's disability determination was his own testimony. He did not submit any evidence documenting the determination nor did he submit a copy of a Medicaid card in the record. These submissions are not enough to require the ALJ to

---

[19] The claimant has the burden of proving disability by furnishing medical and *other* evidence to the Social Security Administration. 20 C.F.R. § 416.912(a). One piece of such evidence could be a determination by another agency that claimant is disabled. *Id*. § 416.912(b)(5).

give great weight (or any weight for that matter) to another agency's disability determination. The court finds that the ALJ considered all of the evidence upon which the state Medicaid agency relied, and thus, substantial evidence supports the ALJ's determination to deny Plaintiff's disability benefits. The ALJ did not err in failing to mention the finding of disability by DHS for Medicaid.

      **B.**      **Substantial Evidence Supports the ALJ's RFC Finding, and the ALJ did not Err in Failing to Conclude that Plaintiff's Impairments Would Preclude Employment Due to High Absenteeism.**

Plaintiff next alleges that the ALJ erred in his RFC assessment because his impairments would preclude him from obtaining consistent employment due to high absenteeism. (Pl.'s Br. 8). At least to some extent, the evidence upon which Plaintiff relies in his brief consists of his own subjective testimony. However, the objective evidence upon which Plaintiff relies was also considered by the ALJ in making his determination. (Tr. 20-22). The ALJ has the authority to determine a claimant's RFC and should consider all of the relevant evidence of a claimant's ability to work despite his impairments. 20 C.F.R. § 404.1546; *see also Beech v. Apfel*, 100 F. Supp. 2d 1323, 1330 (S.D. Ala. 2000) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)). Viewing the record as a whole, substantial evidence supports the ALJ's implicit finding that Plaintiff can obtain employment without significant absenteeism.

The court finds that the ALJ based his RFC assessment on all of the relevant evidence. Plaintiff contends that he has episodes of depression, hears voices, has been suicidal, and suffers from bipolar disorder, Hepatitis C, dementia, back pain, and arthritis. (Pl.'s Br. 9). Thus, he claims he is unable to work without multiple absences. *Id*. The ALJ first addressed Plaintiff's subjective complaints, and while he did find that Plaintiff's impairments could reasonably lead to his symptoms, he found the intensity, persistence, and limiting effects of those symptoms

described by Plaintiff not fully credible. (Tr. 20). The ALJ's finding that Plaintiff was not fully credible is supported by substantial evidence. The record is replete with Plaintiff's noted noncompliance with both treatment options and medications prescribed for his impairments. (Tr. 297, 315-17). Also, Dr. Reddy acknowledged that Plaintiff reported having back pain but further noted that Plaintiff presented pain medication seeking behavior.[20] (Tr. 315). Still, the ALJ considered and reflected any limitations of these symptoms in Plaintiff's RFC assessment.

Further, the only person to offer any opinion as to Plaintiff's physical work functionality was a case manager, M. Brown. While Brown did specifically indicate that Plaintiff was "unable to do manual labor due to arthritis and back pain," it is unclear from the record whether this was Brown's assessment or Plaintiff's own opinion. (Tr. 322). As the ALJ noted, even if it were Brown's opinion, his opinion reflects an issue that is reserved to the Commissioner. *See* 20 C.F.R. 416.927(c)(d)(1) (noting that even when a *medical source* presents a conclusion of disability by stating a claimant is "unable to work," an issue reserved for the Commissioner, the opinion is not given any special significance).

Plaintiff also points to Shawna Merritt's opinion regarding his mental RFC assessment as supporting the conclusion that he would have high absenteeism. (Pl.'s Br. 9). However, many of Plaintiff's limitations noted by Merritt are in fact reflected in the ALJ's RFC assessment. Merritt's assessment reflects mostly moderate limitations but she did note that Plaintiff had marked limitations in some areas.[21] (Tr. 335-36). Notably, Merritt only found Plaintiff

---

[20] The evidence in the record supporting the ALJ's finding that Plaintiff was not fully credible is not limited to these representative examples.

[21] Merritt noted that Plaintiff had marked limitations in his ability to understand and remember detailed instructions, to carry out detailed instructions and maintain attention and concentration for extended periods, to sustain an ordinary routine without supervision, to complete a normal workday and worksheet without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 335-36).

moderately limited in his ability to maintain regular attendance and to be punctual with customary tolerances. (Tr. 336). The ALJ afforded proper weight to Merritt's opinion as a case worker by giving the opinion "some weight," as evidenced in his RFC finding. (Tr. 22). The ALJ adjusted Plaintiff's RFC to reflect Merritt's opinion by further limiting "light, unskilled work" to encompass Plaintiff's inability to "perform work that requires more than three step instruction;" to "perform jobs that involve concentration on detailed/precision tasks or multi-tasking, reading, computing/calculating or problem solving;" to "work on jobs that require team [work] or working in close physical proximity of co-workers;" to "be required to take initiative or make independent decisions;" and to "have a production quota mandating a specific number of pieces per hour or an up line or down line co-worker depending on claimant for productivity." (Tr. 19).

In addition, viewing the record as a whole, substantial evidence supports the ALJ's determination that Merritt's opinion correlated with a brief downturn in Plaintiff's condition. (Tr. 22). Prior to Merritt's assessment, Plaintiff repeatedly reported that he was "feeling good on his medications" and that his medications made his symptoms manageable. (Tr. 267, 270). His psychiatrists also consistently found Plaintiff to be improving and stable on his medications throughout 2009 and 2010 until his alleged suicide attempt in December 2010. (Tr. 277, 279-80, 283, 288-89, 295).

This abrupt change in Plaintiff's actions also coincided with a period of noncompliance with his medications for three weeks, a problem noted throughout the record. (Tr. 315-17). Merritt conducted her assessment of Plaintiff in March 2011, just a few months after his hospitalization from the suicide attempt. (Tr. 335-36). After Merritt's assessment, there is further evidence in the record that shows Plaintiff was improving and continuing his medications in July 2011. (Tr. 530). Further, Plaintiff's last kept appointment at Easter Seals in April 2012,

suggesting that he was stable with his current and highest GAF at 50. (Tr. 500). In a discharge summary from Easter Seals dated November 29, 2012, their records indicate that Plaintiff was still taking Invega, Seroquel, Clondine, and Norco as of May 2012. (Tr. 500-01).

Based on the evidence in the record as a whole, the ALJ's RFC assessment is supported by substantial evidence, and he did not err in finding that Plaintiff's impairments would not result in high absenteeism and thus preclude employment.

### VII. Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence, and proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed, and a separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this May 16, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE